PHILLIPS PETROLEUM COMPANY AND AFFILIATED SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 34019–87.          Filed July 27, 1993.

*Stephen D. Gardner, Carolyn Jane Schwartz, John Hartje,* and *Ann-Elizabeth Purintun,* for petitioners.

*Val J. Albright, James E. Archie,* and *Stephen C. Coen,* for respondent.

KÖRNER, *Judge:* By statutory notice of deficiency dated July 20, 1987, respondent determined deficiencies in the Federal income tax of Phillips Petroleum Co. (hereinafter Phil-

lips or petitioners) and its affiliated subsidiaries [1] for the taxable years 1975 through 1978. Included in the notice was a determination that none of Phillips' income from sales of liquefied natural gas (LNG) produced in Alaska and sold in Japan to Tokyo Electric Power Co., Inc. (Tokyo Electric), and Tokyo Gas Co., Ltd. (Tokyo Gas), was from sources without the United States. Consequently, respondent decreased petitioners' reported Japanese source foreign oil related income (FORI) related to the sale of the LNG in the amounts of $16,148,324.30, $21,200,613.49, and $25,436,416.48 for the taxable years 1976, 1977, and 1978, respectively, and decreased petitioners' reported Japanese foreign oil and gas extraction income (FOGEI) in the amounts of $6,761,933, $7,691,626, and $9,119,087 for 1976, 1977, and 1978, respectively.[2]

In *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30 (1991), a prior opinion in this case, we held that section 1.863-1(b), Income Tax Regs., under which, inter alia, income from the sale of products derived from gas wells located in the United States is deemed to be sourced entirely within the United States was invalid to the extent it conflicts with section 863(b)(2) of the Code, which requires the apportionment, between domestic and foreign sources, of income from the sale of personal property produced within the United States and sold without. We also held that any income from Phillips' sale of LNG produced in Alaska to Tokyo Electric and Tokyo Gas that is foreign source income is FORI under section 907(c)(2). The issue that remains to be decided is the proper allocation or apportionment of the income generated by these sales of LNG to Tokyo Electric and Tokyo Gas as coming from domestic or foreign sources. All other issues arising from the notice of deficiency have been resolved by either agreement, concession, or prior opinion.[3]

All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are

---

[1] The activities that gave rise to the issue addressed by this opinion were undertaken only by Phillips Petroleum Co. and not by any of its subsidiaries with which it filed a consolidated return.

[2] These amounts differ from those reported by petitioners on their returns and are attributable to certain adjustments agreed to by the parties prior to the issuance of the notice of deficiency.

[3] The instant opinion is the fourth one which has been rendered in this case, which was divided into parts for purposes of trial and opinion. The first opinion is found at 92 T.C. 885 (1989), the second at T.C. Memo. 1991-257, and the third at 97 T.C. 30 (1991).

to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

FINDINGS OF FACT

Some of the facts in this case are stipulated and are so found. The stipulations of facts and their accompanying exhibits are incorporated by this reference.

Phillips' principal place of business was Bartlesville, Oklahoma. Phillips was the common parent of an affiliated group of corporations that filed consolidated U.S. corporation income tax returns on the basis of the calendar year using the accrual method of accounting.

Phillips engaged primarily in the business of acquiring, exploring, developing, and operating oil and gas properties and selling the production therefrom, including liquefied natural gas.

The production and sale of LNG by Phillips to Tokyo Electric and Tokyo Gas, in brief, took the following form. Phillips extracted natural gas from oil and gas leases located in the North Cook Inlet of Alaska and liquefied the natural gas at a plant near Kenai, Alaska. The LNG was transported by tanker to Japan and sold in Japan to Tokyo Electric and Tokyo Gas pursuant to a long-term contract.

1. *The Nature of LNG*

LNG, a colorless, odorless liquid, is natural gas that has been cooled to around -259° Fahrenheit, or -161° Celsius. It occupies approximately 1/600th of the volume of natural gas at a temperature of 60° Fahrenheit. LNG may be transported, regasified, and then used as natural gas. The cold, or cryogenic, component of LNG can be sold or utilized separately from the regasified LNG.

2. *The Negotiations*

In 1962, Phillips was part of a group that discovered natural gas in the North Cook Inlet field in Alaska. Phillips concluded that this natural gas was marketable only as LNG and that the market for this product was the Far East.

Phillips, in the 1950s, had begun to develop business relationships with Japanese companies. In particular, it had licensed technology to Showa Denko (a Japanese company)

and had aided Showa Denko in the startup of a polyethylene plant.

To further its business in Japan, Phillips relied on Phillips Petroleum International Corp. (PPIC), a wholly owned subsidiary, and Phillips Petroleum International, Ltd. (PPIL), which was wholly owned by PPIC.

In June and July 1963, John Horn (Horn), who was then the assistant manager of natural gas for Phillips in its gas and gas liquids group, traveled to Japan for 5 or 6 weeks. Horn was Phillips' main negotiator in its effort to sell its Alaskan natural gas, and the purpose of his trip was to determine the interest in Japan for Alaskan LNG. Phillips decided to deal directly with any potential customers instead of relying on a Japanese trading company, which serves in Japan as a middleman between the producer and a buyer, since PPIL and Showa Denko were available to assist it in finding customers and to advise it regarding the conduct of business in Japan.

PPIL and Showa Denko provided Horn with introductions to certain Japanese companies, and PPIL assisted Horn in meeting with these prospective customers.

Horn made two additional trips to Japan in 1963 regarding the sale of LNG, and was accompanied by other employees of Phillips, including engineers and other professionals. Horn made three or four trips to the Far East, including Japan, in 1964 to sell Phillips' Alaskan LNG.

As a result of his meetings with various firms in Japan, Horn determined that the most likely customer of Phillips' Alaskan LNG was Tokyo Gas. Tokyo Gas was interested in purchasing 225,000 tons of LNG annually. In 1965, the quantities of LNG being discussed for sale to Japan increased dramatically when Tokyo Electric, which had decided to use LNG in the generation of electricity because environmental laws required it to use low sulphur fuels, also expressed interest in acquiring LNG. Tokyo Electric and Tokyo Gas decided to purchase together 960,000 tons of LNG per year. The increased amount of LNG demanded by these firms would allow Phillips to achieve certain efficiencies of scale in the production and delivery of LNG.

Horn made four or five trips in 1965 to Japan to negotiate a deal with these entities. Executives and technical personnel

of Tokyo Electric traveled to the United States at the invitation of Phillips to observe its operations.

As part of its negotiation strategy, Phillips believed that low sulphur oil was a substitute for LNG and consequently that it imposed a constraint upon the price it could obtain for LNG. Phillips was also concerned about its ability to persuade these Japanese buyers of the adequacy of its North Cook Inlet field natural gas reserves to supply the revised annual LNG volumes over the term of any contract.

Phillips faced competition from other LNG suppliers interested in selling their LNG to Tokyo Electric and Tokyo Gas. Included in this group were Marathon Oil Co. (Marathon), with natural gas reserves in Alaska, and the Conch group, comprising Continental Oil Co., Shell Oil Co., and Chicago Stockyards, with natural gas reserves in Brunei, a small country located on the northwest coast of Borneo Island.

After receiving approval from Phillips' executive committee,[4] Horn, on November 18, 1965, made an unsuccessful offer to sell to Tokyo Electric and Tokyo Gas 960,000 metric tons of LNG for a period of 20 years at a price of $.5445 per million Btu (MMBtu).[5]

Phillips believed that it needed to bring in Marathon[6] to obtain the contract to supply Tokyo Electric and Tokyo Gas with LNG. By early 1966, Marathon agreed to form a joint venture with Phillips to sell LNG to these Japanese entities. In 1966, Horn made five or six additional trips to Japan to negotiate the sale of LNG. The negotiating team for the sale of Alaskan LNG now included representatives of Marathon.

As of April 1, 1966, Phillips' and Marathon's personnel were of the opinion that Tokyo Gas had orally agreed to purchase LNG at the initial price of 53 cents per MMBtu with staggered increases in price over 20 years. The Conch group, however, at that time offered to supply Tokyo Electric and Tokyo Gas with LNG at 52 cents per MMBtu. Tokyo Gas informed Phillips and Marathon that they would lose the deal if they did not match Conch's offer. Although the deal

---

[4] At Phillips, any proposed project was first reviewed by the operating committee, comprising representatives from several departments, including technical personnel, before it was passed on to the executive committee for final approval.

[5] Btu stands for British thermal unit, which generally means the quantity of heat required to raise the temperature of 1 pound of water 1° Fahrenheit.

[6] Marathon controlled natural gas reserves in the Cook Inlet, Alaska.

would be of marginal profitability, the president of Phillips persuaded the executive committee to approve the sale of Alaskan LNG at this price.

3. *The LNG Sales Agreement*

On June 21, 1966, Phillips and Marathon made an offer to sell 960,000 tons of LNG a year to Tokyo Electric and Tokyo Gas for a 15-year period at a price of 52 cents per MMBtu delivered in Japan with payment required within 10 days of delivery. Tokyo Electric and Tokyo Gas informally accepted this offer.

The sale of LNG by Phillips to Tokyo Electric and Tokyo Gas during the years in issue arose from an LNG sales agreement finally executed by Phillips and Marathon, as sellers, and Tokyo Electric and Tokyo Gas, as buyers, on March 6, 1967. Pursuant to the terms of the LNG sales agreement, Phillips and Marathon agreed to sell and Tokyo Electric and Tokyo Gas agreed to buy 960,000 metric tons[7] of LNG a year for 15 years commencing June 1, 1969, produced from natural gas reserves located in Alaska. Tokyo Electric was to receive 75 percent of the quantity of LNG to be delivered under the agreement and Tokyo Gas the remaining 25 percent. Phillips and Marathon warranted that they owned and controlled volumes of natural gas reserves sufficient to enable them to sell and deliver to the buyers the annual contract quantities of LNG.

The LNG sales agreement also called for Phillips and Marathon to construct, maintain, and operate liquefaction facilities in Alaska sufficient in size to enable them to liquefy and deliver to the buyers the annual quantities of LNG purchased and sold under the contract. The sellers were also responsible for providing the LNG tankers to deliver the LNG. Tokyo Electric and Tokyo Gas were to own docking, unloading, and receiving facilities capable of handling and accommodating the LNG tankers at Tokyo Gas' Negishi plant in Yokohama, Japan.

The point of delivery of the LNG was to be the flange connecting the unloading piping of the LNG tanker with the piping of Tokyo Gas in Yokohama, Japan, and title to the LNG was to pass from sellers to buyers at the point of deliv-

---

[7] A metric ton is a unit of weight equal to 1,000 kilograms.

ery. The LNG sales agreement provided that the sellers were responsible for measuring the quantities of LNG delivered, and that the buyers were responsible for measuring the quality of the LNG delivered.

The price of the LNG was set forth in the LNG sales agreement as follows:

*Section 9.1* (a) Buyers shall pay Sellers for all LNG delivered to Buyers hereunder prior to June 1, 1984, a price of United States fifty-two cents (52¢) per million Btu's delivered.

(b) If in the future another Liquefied Natural Gas project is placed into operation to supply Japan with natural gas from foreign gas sources, such as Alaska, Canada, Australia, Brunei and the Middle East under similar conditions such as volume, distance, liquefaction and ocean transportation techniques, contract term and so forth, Sellers will hold a discussion with Buyers concerning the price as herein set forth, and shall endeavor to find a solution satisfactory to all parties concerned.

The LNG sales agreement provided that all taxes and duties imposed by government bodies outside Japan with respect to LNG sold and delivered under the agreement were to be paid by Phillips and Marathon, and all taxes and duties imposed by the Japanese governmental bodies were to be paid by Tokyo Electric and Tokyo Gas. The LNG sales agreement was expressly subject to the sellers' and buyers' obtaining necessary governmental approvals. Under the terms of an agreement related to the LNG sales agreement, Phillips was to provide 70 percent of the LNG sold, and Marathon was to supply the remaining 30 percent.

### 4. *Implementation of the LNG Sales Agreement*

None of the tangible property that would be needed to produce and deliver LNG under the LNG sales agreement was in place at the time the LNG sales agreement was executed.

Phillips proceeded to develop its holdings of natural gas in the North Cook Inlet field to satisfy its obligation under the LNG sales agreement. Phillips had a Japanese firm construct a platform (the Tyonek platform) that was placed on site in the North Cook Inlet field in June 1968. Twelve natural gas wells were drilled from it during 1969 and 1970. The natural gas from this field was not produced in association with oil and was in excess of 99 percent pure methane.

Two 10-inch subsea pipelines, each approximately 13 miles long, connected the platform to the shore. These lines were

connected to a pipeline that ran approximately 30 miles to a natural gas liquefaction plant located near Kenai, Alaska.

The Phillips Gas Supply Corp. (PGSC) owned the offshore/onshore pipeline and leased the pipeline to Phillips, under a lease entered into in November 1969 and in effect during the years in issue. Under the terms of the lease, certain "additions, changes, alterations, and replacements which [were] reasonably identifiable as separate items of equipment or machinery [were to] remain the property" of Phillips. Phillips guaranteed the payment of the loan PGSC had taken out to construct the pipeline.

Phillips owned 49 percent of the stock of PGSC, and First National City Bank owned the remaining 51 percent as trustee for the Phillips Petroleum Co. Retirement Income Plan (Phillips retirement plan) during the years at issue. PGSC filed corporate Federal income tax returns with respondent separate from those filed by petitioner.

Phillips and Marathon caused to be constructed near Kenai, Alaska, the aforementioned natural gas liquefaction plant, referred to hereinafter as the Kenai LNG plant, and related structures which included storage, docking, and loading facilities. Prior to January 1, 1970, the Kenai LNG plant facilities were transferred to the Kenai LNG Corp., the stock of which, during the years at issue, was owned 21 percent by First National City Bank as trustee for the Phillips retirement plan, 30 percent by Marathon, and 49 percent by Phillips. On or about May 1, 1969, Kenai LNG Corp., Phillips, and Marathon executed an agreement under which Phillips and Marathon leased the Kenai LNG plant from Kenai LNG Corp. This lease was in effect during the years at issue. Kenai LNG Corp. filed corporate income tax returns with respondent separate from those filed by petitioner or by Marathon.

The Kenai LNG plant removed impurities from and reduced the temperature of the natural gas it received from Phillips and Marathon. As a result of the reduction in temperature, the natural gas was changed from a gas to a liquid and certain unwanted components of the natural gas were removed. Following liquefaction, the LNG was stored in insulated storage tanks at near atmospheric pressure and at a temperature of about -259° Fahrenheit. The LNG was then loaded onto tankers and transported to Japan.

In or about March 1967, Phillips and Marathon executed an agreement by and between themselves relating to the construction of LNG tankers to transport the LNG sold under the LNG sales agreement from Alaska to Japan. This agreement contemplated the formation of one or more corporations to own the LNG tankers. Phillips and Marathon executed two separate transportation agreements in March 1968, one with Polar LNG Shipping Corp. (Polar Shipping) and another with Arctic LNG Transportation Co. (Arctic Transportation). Under the terms of these agreements, Polar Shipping and Arctic Transportation, each committing one LNG tanker, agreed to transport the LNG called for by the LNG sales agreement to Japan for Phillips and Marathon. The term of each of the agreements was approximately 23 years, subject to extension on an annual basis thereafter.

Polar Shipping had an LNG tanker constructed known as the *Polar Alaska*, and Arctic Transportation an LNG tanker called the *Arctic Tokyo*; both tankers were registered in Liberia. The *Polar Alaska* and *Arctic Tokyo* were sister ships, each having cargo capacity of approximately 71,000 cubic meters. These two vessels were sized to meet the Kenai LNG plant's production capacity and to fit the docks and unloading facilities in Alaska and Japan. These were the largest LNG tankers ever built at the time they went into operation, and were the first to use a gas transport system, in which the LNG cargo containers did not protrude above deck.[8] They were also equipped to withstand the extreme weather conditions of the Alaska to Japan trade route. Phillips owned 49 percent of the stock of Polar Shipping, First National City Bank as trustee for Phillips' retirement plan 21 percent, and Marathon 30 percent. Phillips, First National City Bank, and Marathon owned exactly the same percentages of the stock of Arctic Transportation. During the years at issue, the tankers were staffed with Italian officers and a Filipino crew. They had an excellent safety and operating record.

The LNG was loaded onto these LNG tankers at a point 2 to 3 miles from the LNG plant in water that remained ice free during the winter. The LNG remained largely in its liquid state during its transportation to Japan.[9] The LNG tankers

---

[8] At this time, only a few LNG tankers were in operation, and they used the Moss system, which involved spherical cargo containers that rose above deck.

[9] Approximately 5 percent of the LNG cargo vaporized en route to Japan, and this regasified

operated according to a schedule set nearly 6 months in advance of the delivery date. The LNG was offloaded under the supervision of the buyers and their representatives, and stored at Tokyo Gas' LNG terminal in Yokohama, Japan, until vaporization. During the years at issue, this terminal also received LNG from Brunei.

The first delivery of Alaskan LNG to Tokyo Electric and Tokyo Gas occurred in November 1969. From 1969 through 1978, Phillips and Marathon delivered over 300 cargoes of LNG to Tokyo Electric and Tokyo Gas pursuant to the LNG sales agreement. The *Arctic Tokyo* and *Polar Alaska* made all of the voyages except for two undertaken by another LNG tanker called the *Kenai Multina*.

## 5. *Negotiations Regarding Increasing the Price of LNG*

After the LNG project had become operational, Phillips determined that the economics of the LNG project were unfavorable at the contracted price. In March 1972, Phillips' and Marathon's representatives, relying on paragraph 9.1(b) of the LNG sales agreement, quoted *supra* p. 84, which became effective after an LNG project in Brunei was put in place to sell LNG to Japan, met with Tokyo Electric and Tokyo Gas to discuss the possibility of increasing the price of LNG due to increased cost of production, liquefaction, and transportation. Several meetings were held at which both sides argued whether the economics of the trade justified their respective positions relative to changing the price of the LNG under the LNG sales agreement. These meetings were attended also by PPIL personnel. On April 28, 1972, the parties to the LNG sales agreement executed an amendment increasing the price to 57 cents per MMBtu effective April 28, 1972. Horn made three or four trips to Japan in 1972 to renegotiate the price of LNG.

Following a worldwide crisis of oil supplies in October 1973, Phillips, Marathon, Tokyo Electric, and Tokyo Gas met again in Japan in December 1973 to discuss the price of LNG under the LNG sales agreement.

By letter dated December 26, 1973, Horn requested that the price of LNG be increased to $1.2545 per MMBtu. The change in price was justified, Horn claimed, by the world-

---

LNG was used as fuel or vented into the atmosphere.

wide energy situation, by the political situation in the United States, which might result in forbidding exports of energy at prices below those which the United States paid for energy imports, and on economic grounds. No agreement having been reached by February 11, 1974, Horn, by letter, requested a price increase starting at 91 cents per MMBtu and increasing to $1.2545 per MMBtu after June 1, 1974. The letter explained that "strong political pressures continue to be exerted to restrict the export of energy from the United States." As a result of meetings held from March 4 through March 14, 1974, Tokyo Electric and Tokyo Gas agreed to an increase in the price for the contracted amounts of LNG under the LNG sales agreement from 57 cents to $0.684 per MMBtu. Horn made 10 trips to Japan in 1973 to renegotiate the price of LNG and 5 or 6 trips in 1974.

Negotiations to increase the price of the LNG were also held in subsequent years. At these discussions, the parties raised essentially the same points adumbrated above—economics, the possibility of U.S. Government intervention, etc.—and these negotiations were in general as extensive as those already mentioned.

John Horn made four trips in each of the years at issue to Japan in connection with price discussions with Tokyo Electric and Tokyo Gas.[10]

The LNG sales agreement was amended on the following dates to reflect the following changes in price:

| Date executed | Effective date | Price per MMBtu |
|---|---|---|
| 04/28/72 | 05/01/72 | $0.5700 |
| 03/12/74 | 03/12/74 | 0.6840 |
| 09/30/74 | 10/01/74 | 0.9999 |
| 12/28/74 | 01/01/75 | 1.1000 |
| 03/31/75 | 04/01/75 | 1.4000 |
| 10/09/75 | 10/01/75 | 1.5500 |
| 04/28/76 | 04/01/76 | 1.7000 |
| 12/08/76 | 01/01/77 | 1.9500 |
| 12/22/77 | 01/01/78 | 2.1500 |
| 03/02/79 | 04/01/79 | 2.3600 |

[10] Phillips is unable to itemize the costs related to its activities to sell Alaskan LNG in the 1960s and those related to the discussions to change the price of the LNG, including the years at issue.

## 6. *Further Negotiations Regarding the Sale of Alaskan LNG*

After the original LNG sales agreement was signed, Tokyo Electric and Tokyo Gas expressed interest in obtaining significant additional supplies of LNG. Representatives of PPIL met with them to discuss the sale of additional LNG. The major question raised by Tokyo Electric and Tokyo Gas concerned whether Phillips and Marathon had adequate reserves to supply additional quantities of LNG.

At this time, around 1969, Phillips estimated that there was approximately 25 MMcfd (million cubic feet per day) of unused capacity at the Kenai LNG plant, and that the *Polar Alaska* and the *Arctic Tokyo* could deliver 37 cargoes of LNG per year to Japan, 3 more than they were making at that time.

In May 1972, Phillips and Marathon formally agreed to sell and Tokyo Electric and Tokyo Gas agreed to buy additional LNG for 60 cents per MMBtu to the extent that Phillips and Marathon were ready to deliver quantities greater than called for by the LNG sales agreement.

On January 17, 1975, Phillips and Marathon gave notice to Tokyo Electric and Tokyo Gas that they were terminating the May 2, 1972, agreement to provide additional volumes of LNG to Tokyo Electric and Tokyo Gas. They took the position that "various rulings and opinions issued by the Federal Power Commission with regard to other LNG transactions establish that * * * [Phillips and Marathon] could not obtain governmental approvals and/or authorizations, satisfactory to [Phillips and Marathon] for the additional deliveries of LNG." Phillips expressed similar concerns in canceling deals with U.S. buyers of the excess LNG; it felt that it would face Federal regulation of the price it charged for the LNG were it to pursue these sales.

## 7. *Use of LNG by Tokyo Electric and Tokyo Gas*

Tokyo Electric used the natural gas derived from the regasification of the LNG it purchased from Phillips and Marathon for the generation of electric power at its Minami Yokohama power station. This power plant was the first in Japan to rely exclusively on LNG to generate electric power.

Tokyo Gas used the LNG as one of several raw materials for the city gas it produced. Tokyo Gas regasified the LNG it

purchased from Phillips and Marathon and reformed[11] the resulting natural gas and/or blended it with other gases having higher or lower heating values before selling this product to its customers.

At the time of the execution of the first LNG sales agreement, Tokyo Gas distributed natural gas that conformed to a 5,000-kilocalorie standard. In 1972, Tokyo Gas began the process of converting its distribution system to deliver natural gas containing 11,000 kilocalories. Phillips' LNG did not conform to either standard; it contained approximately 9,600 kilocalories.

The chill factor, or cooling element, of approximately 20 to 30 percent of the LNG sold to Tokyo Gas was used in the course of its regasification for cooling purposes in the liquefaction of oxygen, nitrogen, and argon by Tokyo Liquefied Oxygen Co., which was partially owned by Tokyo Cryogenics Industries Co., a subsidiary of Tokyo Gas.

## 8. *Sales Other Than to Tokyo Electric and Tokyo Gas*

Except for two sales of LNG, Phillips sold the LNG it produced at the Kenai LNG plant through 1978 exclusively to Tokyo Electric and Tokyo Gas. In 1970, one spot sale of LNG was made to Standard Oil Co. of New Jersey (Esso). In 1977, Phillips and Marathon sold 440,000 barrels of LNG to Columbia Gas Transmission Corp. (Columbia Gas) at a price of $1.55 per MMBtu, f.o.b. the tanker. Columbia Gas was responsible for transportation of the LNG.

Phillips also sold domestically small amounts of natural gas from the North Cook Inlet field.

## 9. *Other LNG Projects*

LNG projects normally involve specific sellers and specific buyers using specific hardware and gas reserves. Until 1978, no LNG plant or terminal had ever been built before a contractual selling commitment was in place. There were few spot sales of LNG, since almost all of the sales of LNG had been pursuant to long-term contract.

---

[11] Reforming is a process whereby the molecular structure of material is broken down into smaller molecules.

LNG was delivered to Japan from the following sources at the following times and at the following prices per MMBtu:

| Year | Alaska[1] | Brunei | Abu Dhabi | Indonesia (Arun & Badak) |
|------|-----------|--------|-----------|--------------------------|
| 1974 | $0.73 | $1.58 | None imported | None imported |
| 1975 | 1.36 | 1.78 | None imported | None imported |
| 1976 | 1.64 | 1.87 | None imported | None imported |
| 1977 | 1.95 | 2.02 | $2.00 | $2.57 |
| 1978 | 2.18 | 2.17 | 2.20 | 2.79 |
| 1979 | 2.30 | 2.36 | 2.30 | 3.42 |
| 1980 | 4.85 | 4.91 | 5.50 | 5.24 |

[1] Supplied from petitioner and Marathon.

## 10. *PPIL and PPIC*

Prior to the execution of the original LNG sales agreement, PPIL had assisted Phillips in various capacities regarding its efforts to sell Alaskan LNG to Japan, including but not limited to introducing Phillips to prospective clients and providing interpreters at negotiating sessions.

After the LNG sales agreement was signed, some of the employees of PPIL communicated on occasion with representatives of Tokyo Electric and Tokyo Gas, including visiting the offices and/or facilities of these customers. PPIL employees also gathered price information on other projects selling LNG to Japan, and suggested strategies for renegotiating the price with Tokyo Electric and Tokyo Gas. Representatives of PPIL were almost always present at the price negotiations.

PPIL employees assisted Phillips and Marathon in establishing shipping schedules for delivery of LNG to Tokyo Electric and Tokyo Gas, and made suggestions regarding the hiring of crew and officers for the LNG tankers.

On occasion, employees of Phillips, including Horn, would visit the offices of PPIL in Tokyo, Japan. These visits to the offices of PPIL concerned sales of LNG to Tokyo Electric and Tokyo Gas, and at times involved specifically the preparation for price negotiations with Tokyo Electric and Tokyo Gas.

PPIL maintained offices in Tokyo, Japan, during the years at issue. The offices covered approximately 4,300 square feet of area and contained standard office equipment, including desks, chairs, telephones, typewriters, and filing cabinets.

PPIL employed 28 individuals at various times during the taxable years 1976, 1977, and 1978.

Phillips and PPIC executed a document entitled "service agreement" effective January 1, 1976. Under the terms of the service agreement, the services relating to the sale of LNG to Tokyo Electric and Tokyo Gas which PPIC was to perform included without limitation "assistance with respect to communication between the parties, arranging for meetings in Japan where necessary, supply of translation and interpretation services." PPIC had no authority to enter into a contract on behalf of, or otherwise bind, Phillips. In return for these services, Phillips agreed to pay PPIC a service fee of $100,000 in 1976, $11,000 per month during 1977, and $13,500 per month during 1978.

PPIC appointed PPIL to perform the liaison and coordination services related to the sale of LNG by Phillips to Tokyo Electric and Tokyo Gas required under its contract with Phillips.

### 11. *Interfirm Relations in Japan*

Keiretsu, a Japanese economic concept, generally refers to a group of companies affiliated to further efficiency by maintaining long-term, multifaceted, intensive relationships. These include interlocking directorates, cross-ownership or cross-shareholding, established trading relationships and contracts, subcontracts, and other business relationships.

The relationship between Phillips and Marathon on the one hand, and Tokyo Electric and Tokyo Gas on the other, did not rise to the level of keiretsu. Neither Phillips nor Marathon ever owned any stocks in either Tokyo Electric or Tokyo Gas or vice versa. There were no interlocking directorates between either Tokyo Electric or Tokyo Gas and Phillips or Marathon.

Shōken, a Japanese legal and economic concept, describes a closer-than-usual form of business relationship between firms that in economic terms allows the parties to maximize their profit level over time and to reduce the variability of performance. A firm does not need to be a member of a keiretsu in order to have shōken, which means, broadly speaking, rights to trade, or, in a similar sense, commercial goodwill. In this case, it is urged that Phillips had shōken to sell Alaskan LNG to Tokyo Electric and Tokyo Gas, which

was first gained, petitioner's expert testified, at the time Phillips and Marathon won the sales contract. We find this alleged fact not proved.

12. *Income and Deductions for the Years at Issue*

Phillips and Marathon delivered 35,335,457 MMBtu, 36,326,422 MMBtu, and 34,383,752 MMBtu of LNG to Tokyo Electric and Tokyo Gas in 1976, 1977, and 1978, respectively. Phillips received $58,645,045, $70,603,176, and $73,894,315 as its share of the revenue from the sale of LNG to Tokyo Electric and Tokyo Gas during 1976, 1977, and 1978, respectively.

Phillips' reported taxable income from the sales of LNG to Tokyo Electric and Tokyo Gas was $33,567,534, $44,131,964, and $47,977,589 for the years 1976, 1977, and 1978, respectively. For Federal income tax purposes, petitioners reported the income from sales of LNG produced in Alaska and sold in Japan as derived partly from sources within and partly from sources without the United States.

Neither Phillips nor any of its subsidiaries paid any taxes of any nature (including, but not limited to, income taxes, value added taxes, excise taxes, etc.) to any foreign country (and/or any foreign governmental division or subdivision) related to the sales of LNG to Tokyo Electric and Tokyo Gas.

OPINION

Section 863(a) provides that items of gross income, expenses, losses, and deductions, other than those specified in sections 861(a) and 862(a), are to be allocated or apportioned to sources within and without the United States under regulations issued by the Secretary. Section 863(b)(2) addresses the sourcing of income derived from the production of personal property within the United States and the sale of that property in another country. The income from this type of transaction is treated as derived partly from sources within and partly from sources without the United States, and the taxable income therefrom may be apportioned by formulas prescribed by the Secretary.

The regulations under this authority were issued in 1922, and have remained in general unchanged for over 70 years.[12] See Regs. 62, art. 327 (1922). For income derived partly from sources within and partly from sources without the United States, the relevant regulations are found in section 1.863-3, Income Tax Regs., which provides three "examples" for the allocation or apportionment of such income. Sec. 1.863-3(b)(2), *Examples (1)*, *(2)*, and *(3)*, Income Tax Regs.[13]

*Examples (1)* and *(2)* of section 1.863-3(b)(2), Income Tax Regs. (hereinafter referred to as example (1) and example (2), respectively), as in effect for 1976-78, are found in the appendix to this opinion.[14]

Example (1) employs the concept of a sale from the taxpayer to an independent selling organization or distributor to separate the portion attributable to production or manufacture from that attributable to marketing or selling. The former is called the "independent factory price." Example (2), effective when example (1) is not applicable, involves the formulaic apportionment of 50 percent of the taxable income to sales and 50 percent to manufacturing, the amounts of which are further apportioned by other formulas to sources within and without the United States.

We have held in this case that Phillips' income from the sale of LNG to Tokyo Electric and Tokyo Gas was derived partly from sources within and partly from without the United States. *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30 (1991). We also held that any of the LNG sales income that is attributable to foreign sources in the years in question is FORI.

Petitioners, on their returns for the years at issue, apportioned the income from the sale of LNG to Tokyo Electric and Tokyo Gas according to example (2). Respondent, in the notice of deficiency, determined that none of the LNG sales income was from sources without the United States, but was all attributable to U.S. sources under section 1.863-1(b), Income Tax Regs. In our prior opinion at 97 T.C. 30, we held

---

[12] For a more complete discussion of the genesis of sec. 863 and the related regulations, see *Intel Corp. & Consol. Subsidiaries v. Commissioner,* 100 T.C. 616 (1993), and *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30 (1991).

[13] The examples in sec. 1.863-3(b)(2), Income Tax Regs., instead of being merely illustrative, state operating rules.

[14] *Example (3)* of section 1.863-3(b)(2), Income Tax Regs., is inapplicable to this case and will not be discussed.

this regulation to be invalid. We further held that section 863(b) of the Code controlled, that the income in question was partly foreign in source, that section 1.863-3(b)(2), Income Tax Regs., covered the computation here, and that the provisions of example (1) therein were mandatory, if there existed an independent factory price (IFP) as a matter of fact in the dealings between petitioner and the Japanese customers. Only where no such IFP existed would the use of example (2) be proper. The case was sent back for further trial to resolve this question, and it is before us now.

## 1. *The Applicability of Example (1)*

Respondent asserts that the sales income from Phillips' sale of LNG to Tokyo Electric and Tokyo Gas must be sourced according to example (1). Respondent claims that an IFP may be derived from these LNG sales since: (1) Phillips is a manufacturer or producer of LNG; (2) the sales were regularly made; (3) they were made to wholly independent distributors or other selling concerns; and (4) the manner in which they were made fairly establishes an independent factory price. Respondent further contends that a branch or selling department located in Japan is not necessary for application of example (1), and, in the alternative, that Phillips did maintain such a selling department in Japan during the years at issue.

Respondent derived the IFP that she used to allocate Phillips' LNG income from sales to Japan in the following manner:

To construct the IFP from these sales, the first step is to identify and classify the expenses between (a) expenses of sales and marketing (referred to in Notice 89-10 [1989-1 C.B. 631] as expenses related to non-production, income-generating activities), (b) expenses of manufacturing or production and (c) transportation, duties, excise taxes, insurance and similar expenses (expenses that are attributable to neither non-production, income-generating activities, nor manufacturing or production).

Respondent subtracted her version of the expenses under categories (a) and (c) from Phillips' annual income from sales of LNG to Tokyo Electric and Tokyo Gas to derive the yearly revenue attributable to production; respondent then computed the average IFP by dividing the latter amount by the

total MMBtu's of LNG sold by Phillips to Tokyo Electric and Tokyo Gas that year.

Respondent arrived at the taxable income attributable to production by subtracting the expenses relating to production from the revenue attributable to production, which according to example (1) is derived from a constructive sale of the LNG between Phillips' manufacturing and marketing branches at the IFP. The remaining revenue is attributable to sales or marketing, and it is, according to respondent's method, offset by the expenses related to sales to arrive at taxable income related to Phillips' selling activity.

Respondent's application of example (1) to Phillips' sales of LNG to Japan results in none of the taxable income derived from Phillips' sales of LNG being attributable to sources without the United States, because the expenses related to marketing and transportation are in effect merely subtracted from the selling price in computing the IFP. Thus, according to respondent's application of example (1), all of the taxable income from the sales will be attributable to production which took place in the United States.[15]

Petitioner argues, in disputing the applicability of example (1) to the sales here at issue, that: (1) Tokyo Electric and Tokyo Gas were not independent distributors or other selling concerns for purposes of this example; (2) the LNG sales to these customers did not establish fairly an independent factory or production price because the sales income reflected more than income attributable to manufacturing or production; (3) the income from the sale from which the IFP was computed may not be allocated using that IFP; and (4) the LNG sales to Tokyo Electric and Tokyo Gas were not made by a foreign selling or distributing branch or department of Phillips.

Petitioner has the burden of proof to show that example (1) does not apply to its sale of LNG to Japan. Rule 142(a). Respondent's notice of deficiency is broadly worded to encompass either the application of the natural resource regulation

---

[15] Respondent asserts that, if we were to hold that a portion of the LNG sales income must be allocated to sources without the United States since the LNG income must be treated as derived from sources partly within and partly without the United States under sec. 863(b), respondent's method of allocation satisfies this prescription since the amount of LNG *sales revenue* offset by the marketing expenses may be treated or characterized as from sources without the United States; in this case, respondent's computation produces a net foreign income result of zero.

invalidated in *Phillips Petroleum Co. v. Commissioner, supra,* or an allocation, according to respondent's interpretation, of income under *Example (1)* of section 1.863-3(b)(2), Income Tax Regs. See *Achiro v. Commissioner,* 77 T.C. 881, 890 (1981). Furthermore, petitioner apportioned this income pursuant to example (2), and may do so only if the requirements of example (1) are not satisfied.[16] *Phillips Petroleum Co. v. Commissioner, supra.*

We must determine the meaning of a legislative regulation, which this is, and for this purpose the rules of interpretation applicable to statutes are appropriate tools of analysis. *General Electric Co. v. United States,* 221 Ct. Cl. 771, 610 F.2d 730 (1979); *Rucker v. Wabash R.R. Co.,* 418 F.2d 146 (7th Cir. 1969). With respect to the interpretation of statutes we have employed the rule that statutes are to be construed so as to give effect to their plain and ordinary meaning unless to do so would produce absurd or futile results, and where a statute is clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein. *Halpern v. Commissioner,* 96 T.C. 895 (1991). Furthermore, all parts of a statute must be read together, and each part should be given its full effect. *Woods v. Commissioner,* 91 T.C. 88 (1988).

In particular, administrative rules are to be construed to effectuate the intent of the enacting body, see *United States v. Larionoff,* 431 U.S. 864, 872 (1977); *Rucker v. Wabash R.R. Co., supra.* Where the meaning of the words used in a regulation is in doubt we are directed to look to the administrative construction of the regulation, and "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Udall v. Tallman,* 380 U.S. 1, 16-17 (1965) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413-414 (1945)).

With these rules of construction in mind, we turn to the meaning of example (1).

---

[16] Even if an independent factory price (IFP) is derived according to the criteria of *Example (1),* sec. 1.863-3(b)(2), Income Tax Regs., the regulation allows a taxpayer to show, subject to the satisfaction of respondent, that an IFP is otherwise established based, for example, on market or comparable prices. Petitioner did not make such a showing.

## a. *Independent Factory Price*

The parties disagree whether an IFP can be derived to allocate Phillips' LNG income. Both parties present at first glance plausible, but substantially differing, interpretations of this term as used in example (1).

The parties agree that example (1) is designed to separate production income from income associated with marketing the product, by means of an IFP. In the case where there is a selling or distributing branch or department of the producer through which the cross-border sale is consummated, example (1) operates by setting up a sale of the item at the IFP to the selling branch or department and attributes the resulting income to production; the difference between the ultimate selling price and the IFP would be income attributable to marketing.

As an economic matter, the income from a sale undertaken by a producer is attributable to various functions performed by it, including production and marketing. In theory, it should be possible to accurately gauge the contributions to the sales income by each of these activities. In practical terms, however, the attribution of taxable income to the respective functions relies on the approximation of income, expenses or both, since none of the branches performing the various activities could be construed as having dealt at arm's length with each other, where there is no "wholly independent" distributor, as example (1) requires.

The parties agree that IFP is a concept that is restricted by the terms of example (1). An IFP, according to example (1), exists only in those circumstances where a "manufacturer or producer regularly sells part of his output to wholly independent distributors or other selling concerns in such a way as to establish fairly an independent factory or production price".

The parties further agree that Phillips is a manufacturer, that it regularly sells part of its LNG output, and that Tokyo Electric and Tokyo Gas are wholly independent of Phillips. The parties, however, differ regarding the meaning attributable to the term "distributor or selling concern" and the phrase "establish fairly an independent factory production price" in example (1). Petitioner maintains and respondent disputes that Tokyo Electric and Tokyo Gas are not distribu-

tors or selling concerns of Phillips' LNG and that the price of LNG that these customers paid does not establish fairly an IFP.

We note initially that IFP is not a term used in section 863(a) or (b) and the parties cite no case, and we have not found any, that deals with the interpretation of IFP as used in example (1), except the recently issued opinion in *Intel Corp. & Consol. Subsidiaries v. Commissioner,* 100 T.C. 616 (1993), holding that for example (1) to apply the taxpayer's selling branch or department of the business must be located in a country other than the country of manufacture or production.

Respondent elaborated for the first time on the meaning of IFP in Notice 89-10, 1989-1 C.B. 631, and she relies on this pronouncement to derive an IFP to be applied to Phillips' LNG sales income.[17] Petitioner, on various grounds, argues that we should disregard Notice 89-10 and focus only upon the language of example (1). We do not agree with petitioner that Notice 89-10 is a "thinly veiled attempt to influence this litigation." See *Tandy Corp. v. Commissioner,* 92 T.C. 1165, 1170 (1989). Although this administrative pronouncement was issued in the course of this litigation, it is general in nature and does address the meaning of certain terms that are not patently clear. We note that the Commissioner has a "continuing duty to interpret and apply the Internal Revenue Code" and may do so through administrative pronouncements rather than regulations. *Bob Jones Univ. v. United States,* 461 U.S. 574, 597 (1983). However, we agree with petitioner that respondent may not "override the express language of * * * [her] regulations" by administrative action. *Honeywell Inc. v. Commissioner,* 87 T.C. 624, 635 (1986) (respondent attempted by revenue ruling to restrict the meaning of a term in a regulation that had a clear meaning); *Udall v. Tallman, supra.*

---

[17] We note that this notice is an "administrative pronouncement" and pursuant to sec. 1.6661-3(b)(2), Income Tax Regs., may be relied on to the same extent as a revenue ruling or revenue procedure. We further note that such pronouncements do not have the force of law, are merely statements of the Commissioner's position, and are entitled to no special deference in this Court. *Crow v. Commissioner,* 85 T.C. 376, 389 (1985).

### b. *Distributor*

Under example (1), the IFP must be established fairly by sales from the producer to *wholly independent distributors or other selling concerns.* Example (1) does not define "distributor" or "selling concern".

In Notice 89-10, *supra,* respondent defines "distributor" or "other selling concern" as "a selling business with respect to the relevant product (or a product into which it is integrated or transformed)." In the same notice, respondent also states that a purchaser that retains the product for its own use and does not sell the product or a product into which the product is integrated or transformed is not a distributor or selling concern.

"Distributor", however, has an ordinary meaning. Black's Law Dictionary 475-476 (6th ed. 1990), defines "distributor" as follows:

> Any individual, partnership, corporation, association, or other legal relationship which stands between the manufacturer and the retail seller in purchases, consignments, or contracts for sale of consumer goods. A wholesaler, jobber or other merchant middleman authorized by a manufacturer or supplier to sell chiefly to retailers and commercial users.

Thus, the term ordinarily refers to an entity that obtains the product from the producer and sells the product to retailers or commercial users; its profitability depends generally on its marketing ability. The term, according to this definition, does not imply that a distributor transforms or integrates the product it acquires from the manufacturer; nor does it imply that a distributor is a user of the product. Instead the product the distributor buys is the product it sells. In such circumstances, the distributor has undertaken the marketing activity that the manufacturer would otherwise have to engage in to sell the product to the same entities; an IFP derived from such sales when applied to the cross-border sales might reasonably reflect the income from production.[18]

"Selling concern" is not defined in Black's Law Dictionary. Both parties in their respective briefs do not seriously distinguish between the terms. Respondent, relying on Notice 89-10, *supra,* defines "distributor or other selling concern" as a

---

[18] Even a sale to a distributor as defined in this opinion will involve some marketing or selling activities on the part of the manufacturer, but, presumably, they would reflect the minimum amount of selling that a manufacturer would have to make to secure a sale.

whole, yet in her brief she refers at times only to distributor. From this, we gather that "distributor" and "other selling concern", from respondent's perspective, must have the same meaning. Petitioner, likewise, does not separately define the term. Given the parties' treatment of this term, we conclude that, whatever the meaning of "other selling concern", neither Tokyo Electric nor Tokyo Gas can be so categorized. Thus, we address only the term "distributor".[19]

One interpretation of "distributor" is consistent with the plain meaning of example (1); namely, that the sales used to derive the IFP should reflect income attributable to production in the absence of significant selling activity by the producer. We believe that only in the case of a sale to a wholesaler or similar reselling entity will the price paid likely reflect income solely associated with production, for in that instance it is evident that the manufacturer will not have taken on marketing or selling activities necessary to complete a sale either to a retailer or the product's user; instead, they would have been provided by the distributor.

If respondent's interpretation of the term is accepted, then a baker would be considered a distributor of the flour and yeast used to make the bread it sells, and an automobile manufacturer a distributor of the steel used in the production of its cars. However, in these cases, it is not as clear that the producer of the flour or steel has not engaged in selling activity to which income would be attributable, as it is in the circumstance where the sale at issue was to a wholesaler in such items.

Even respondent at times does not disagree with this analysis. The purpose behind requiring a sale to be made through a distributor in establishing an IFP is that, in respondent's words, "Since the independent distributor performs the marketing or selling activities, the price paid by the distributor to the manufacturer or producer is treated as fairly establishing the manufacturer's or producer's income attributable to manufacturing or production". In the circumstance where a buyer transforms or integrates the product sold by the manufacturer, one cannot say that the price

---

[19] The term "selling concern" strongly implies that the primary activity of the entity is marketing or selling. In the context of example (1), this term probably refers to those entities that sell property on commission; the record does not establish whether Tokyo Electric and Tokyo Gas were involved in commission sales.

thereafter paid necessarily reflects the producer's income attributable only to production.

Furthermore, respondent's interpretation of "distributor" effectively reads its plain meaning out of example (1). Petitioner correctly notes that the criterion in determining initially which sales are to be used in computing an IFP has been changed from whether the sale was to a distributor to the level of the nonproductive income-generating activity undertaken by the manufacturer with respect to the sale. Notice 89-10, *supra,* states that in determining whether particular sales establish fairly an IFP one inquires, inter alia, whether the "non-production income-generating activities" (in general marketing activity) are significant in relation to manufacturing or production; if they are, Notice 89-10, *supra,* holds, the sales will not reasonably reflect the income from manufacturing or production. Respondent's interpretation of "distributor" is so broad that it encompasses nearly all sales made by a producer; respondent distinguishes those sales that may be used to establish an IFP according to the level of marketing or selling activity associated therewith. The *focus under respondent's analysis is* upon the level of marketing activities and not whether the sale, in the first instance, was to a distributor. This is a plain misreading of example (1).

The history of the statute and the regulations provides little if any insight into the construction of the examples of section 1.863-3(b)(2), Income Tax Regs., including the intended meaning of "distributor". The impression left by all the materials and arguments offered by the parties is that for purposes of example (1) a distributor is an entity that does not change the product it acquires; rather, it merely acts as a middleman in the sale of the property to the retailer or, in certain circumstances, to the ultimate consumer.

Having determined the meaning of "distributor" for purposes of example (1), we must inquire whether either Tokyo Gas or Tokyo Electric was a distributor of Phillips LNG.

Tokyo Gas was not a distributor of Phillips' LNG. Tokyo Gas regasified the LNG sold by Phillips and either reformed or blended the resulting gas to achieve a lower or higher caloric content before sale to its customers.

Respondent maintains that Tokyo Gas in fact sold some of the LNG directly to its customers. The evidence offered by her

on this point is unpersuasive and in fact serves to undermine her argument. During the early 1970s, Tokyo Gas began to convert its system from supplying a gas that contained 5,000 kilocalories to one that contained 11,000 kilocalories. Tokyo Gas during the conversion of its system to a higher caloric gas still offered the lower caloric gas until the conversion process was complete; it sold only gas containing either 5,000 or 11,000 kilocalories. The LNG sold by Phillips and Marathon, in contrast, contained 9,600 kilocalories. The record is clear that Tokyo Gas never offered the regasified LNG directly (without alteration) to its customers.[20]

Respondent also claims that Tokyo Electric was a distributor with respect to the energy contained within the LNG purchased from petitioner. This may be so if "distributor" is construed to extend beyond its ordinary meaning. Tokyo Electric did not resell either LNG or regasified LNG it purchased from Phillips. Instead, it burned the natural gas derived from the LNG in its boilers which produced steam that moved turbines, thereby making electricity, which it sold to its customers.

Neither Tokyo Electric nor Tokyo Gas was a distributor, as commonly understood, of the LNG sold to them by Phillips and Marathon. Tokyo Electric and Tokyo Gas did not sell to their customers the same product they received from Phillips. They regasified the LNG and then modified or burned the resulting natural gas. The product they sold was in one instance electric power and in the other instance natural gas that differed significantly in caloric content from the regasified LNG delivered by Phillips.

Although the price paid by Phillips' Japanese customers was measured in MMbtu's, and LNG, natural gas, and electricity are forms of energy, these facts do not affect the outcome. We do not believe that for purposes of example (1) "distributor" was meant to include an entity that transformed the product it acquired from the manufacturer to this degree; to hold otherwise would bleed the term of any operative meaning. Tokyo Electric and Tokyo Gas did not sell the same product that they bought from Phillips. Nor does respondent's characterization of Tokyo Gas as a distributor of the atoms contained in the LNG have any merit.

---

[20] Tokyo Gas sold the cold, or cryogenic, component from some of the LNG directly to its second tier subsidiary. Respondent does not assert that these sales make Tokyo Gas a supplier of LNG for purposes of example (1).

We agree with petitioner that Tokyo Electric and Tokyo Gas were not distributors or selling concerns of Phillips' LNG within the ordinary and plain meaning of these terms. The record here does not disclose any other "wholly independent distributor", located outside the United States, *Intel Corp. & Consol. Subsidiaries v. Commissioner,* 100 T.C. 616 (1993), which was a purchaser of Phillips' LNG so as to establish an IFP under example (1). We conclude that example (1) does not govern the allocation of income here.

### 2. *The Applicability of Example (2)*

Since we have held that example (1) is inapplicable to allocate Phillips' income from the sale of LNG to Tokyo Electric and Tokyo Gas for the years at issue, this income must be apportioned pursuant to example (2). *Phillips Petroleum Co. v. Commissioner,* 97 T.C. 30 (1991).

At the outset we note that there have been no cases interpreting example (2) and no administrative pronouncements regarding its application since the regulation was promulgated in 1922, except for the necessary inferences to be drawn from *Intel Corp. & Consol. Subsidiaries v. Commissioner, supra.*

Example (2) operates by first dividing in halves the annual *taxable* income attributable to sales of property produced in the United States and sold in a foreign country, or vice versa; these two amounts are then further apportioned to sources within the United States according to formulas based on the value of property held or used in the United States to produce the income, in the case of the first half, compared to total productive assets in the United States and the foreign country involved, and on the level of gross sales within the United States, compared to total sales in the United States, and within the foreign country in the case of the second half. The income not apportioned to sources within the United States is sourced within the foreign country.

Thus, as to the half of taxable income apportioned according to sales, the portion of this amount attributable to sources within the United States is determined "by multiplying such one-half [of the taxable income] by a fraction the numerator of which consists of the taxpayer's gross sales for the taxable year or period within the United States, and the denominator of which consists of the taxpayer's gross sales

for the taxable year or period both within the United States and within the foreign country" (sales apportionment fraction). Sec. 1.863-3(b)(2), *Example (2)(ii)*, Income Tax Regs.

The location of a sale of property, whether within the United States or a foreign country, is determined by the passage of title rule. Secs. 1.863-3(a)(2) and 1.861-7(c), Income Tax Regs. Title to the LNG produced in the United States and sold to Tokyo Electric and Tokyo Gas passed in Japan. There were no sales of LNG by Phillips produced in Japan and sold in the United States. Thus, the numerator of the sales apportionment fraction used to determine the portion of the half of Phillips' taxable income from the sale of LNG apportioned in accordance with gross sales attributable to sources within the United States is zero. Consequently, the one-half of Phillips' taxable income that is to be apportioned according to gross sales is sourced entirely to Japan, and none of this amount is attributable to sources within the United States.

The remaining half of Phillips' taxable income from the sales of LNG to Tokyo Electric and Tokyo Gas is apportioned as follows: a portion of this half, attributable to U.S. sources, is determined by multiplying such half by a fraction, the numerator of which consists of the value of the Phillips' LNG producing property within the United States, and the denominator of which consists of the value of such property both within the United States and within the foreign country (property apportionment fraction). Sec. 1.863-3(b)(2), *Example (2)(ii)*, *(iv)*, Income Tax Regs. The parties raise several issues regarding the application of the property apportionment fraction to Phillips' LNG sales income. They disagree over the inclusion, the location, or the value of certain items of property.

"Property", defined for purposes of the property apportionment fraction, includes only property "held or used" to produce income derived from the LNG sales. Sec. 1.863-3(b)(2), *Example (2)(iv)*, Income Tax Regs. The property held or used to produce Phillips' LNG sales income consisted of the following (without reference, at this point, to (a) whether it was Phillips' property; (b) the location of the property; or (c) the value of the property):

(i) Phillips' North Cook Inlet field oil and gas leases;

(ii) the Tyonek Platform and other gas production facilities in the North Cook Inlet;

(iii) the offshore-onshore pipeline connecting Phillips' North Cook Inlet field gas production facilities to the liquefaction plant at Kenai;

(iv) the gas in the pipeline;

(v) the liquefaction plant;

(vi) the LNG tankers *Polar Alaska* and *Arctic Tokyo;*

(vii) Phillips' LNG inventory;

(viii) Phillips' accounts receivable from Tokyo Electric and Tokyo Gas;

(ix) Phillips' cash working capital for the Kenai LNG project; and

(x) Phillips' prepaid Alaska asset/ad valorem tax.

a. *Ownership of the Property*

Phillips did not directly own all of the aforementioned property used to produce the income derived from its LNG sales to Tokyo Electric and Tokyo Gas. Instead, Phillips leased from PGSC the pipeline connecting Phillips' North Cook Inlet field gas production facilities to the Kenai LNG plant, as well as the Kenai LNG plant itself, and the two LNG tankers. However, Phillips held stock in the corporations that owned these properties.

The parties disagree as to whether leased property is to be included in the property apportionment fraction. Petitioner asserts that since the leased property was used to produce the LNG sales income, the value of these assets should be included in the property apportionment fraction. It claims that "whether the manufacturer owns or leases the * * * [property], and whether it leases the * * * [property] from its wholly owned subsidiary or from an unrelated party, the * * * [property] is what produces the manufacturer's export sales income." It also claims that if only the leases of these properties were taken into account for purposes of the property apportionment fraction, their inclusion would have little effect on the fraction, since a lease generally will not have a book value, and will have little fair market value unless its terms were favorable compared to the market. Petitioner argues that failure to include the value of the leased property or to include something on the value of the leases would distort the apportionment of income under example (2). Petitioner concludes that its share, based upon use, of the property used to produce the LNG sales income should be taken

into account in the property apportionment fraction of example (2). Thus, 100 percent of the value of offshore-onshore pipeline and 70 percent of the Kenai LNG plant and the LNG tankers should, it claims, be included in the property apportionment fraction.

Respondent disagrees. She asserts that subdivision (iv) of example (2), which states that property for purposes of the apportionment formula includes property "held or used" to produce the income which is to be apportioned is qualified by subdivision (ii) of example (2), which in defining the numerator and denominator of the property apportionment fraction references only the "taxpayer's property".

In order to resolve this issue, we refer to the rules of textual construction set forth in the preceding section addressing the application of example (1). We note that we are in the first instance to apply a regulation according to its plain or ordinary meaning unless such interpretation would lead to absurd results or another construction is supported by unequivocal evidence of administrative intent. Cf. *Halpern v. Commissioner*, 96 T.C. 895 (1991).

The ordinary and plain meaning of example (2) is that only property owned by the taxpayer is includable in the property apportionment fraction. No absurd results follow from such a construction of the property apportionment fraction. Petitioner has offered no evidence, much less unequivocal evidence, of congressional or administrative intent that a taxpayer's property also describes leased property. We note that if the Secretary had intended to include leased property in the property apportionment fraction, the definition of property would likely have expressly included leased property, and would not have repeated the phrase "taxpayer's property" three times in example (2)(ii). Cf. 1 Hellerstein & Hellerstein, State Taxation, sec. 9.2 [1] (2d ed. 1993) (in apportioning the income of interstate business according to the location of property, States did not traditionally include leased property in their property apportionment fraction; modern versions of this method of apportionment generally state that leased property used to produce the income is to be included).

Although example (2) involves the application of an arbitrary formula to apportion taxable income between sources within the United States and within the foreign

country, not to include leased property is consistent with the apparent structure of the property apportionment fraction. We note that in deriving the total taxable income to be apportioned, Phillips is allowed to deduct lease payments with other legitimate expenses, example (2)(i); if Phillips had owned the leased property, the amount of taxable income that would be apportioned under the property apportionment fraction would be larger to the extent of the lease payment, which would not be an allowable deduction. If leased property were not included therein, the taxable income to be apportioned and the property used in the property apportionment fraction would be correspondingly less; under petitioner's interpretation there would be an inherent mismatch. Thus, we conclude that leased property used to produce the taxable income to be apportioned is not included in applying the property apportionment fraction.[21]

### b. *The Location of Property*

The parties also differ as to how the property apportionment fraction should apply to property that is located neither in the United States nor Japan. This point involves only the LNG inventory, which was located at times in the United States, in Japan, and in international waters. The parties have stipulated the value of the LNG inventory for purposes of example (2) within the United States, within Japan, and in international waters.

Petitioner argues that under the destination approach used to determine the situs of property in estate tax treaties, its LNG inventory in international waters should be treated as property located within Japan. See United States-Australia Estate Tax Convention, May 14, 1953, 5 U.S.T. (Part 1) 92, 95, 1957-1 C.B. 633, 634. In the alternative, petitioner argues that this portion of the LNG inventory should be divided equally between property located within the United States and within Japan. Respondent, on the other hand, points out that example (2)(ii) expressly refers to property within the United States and within the foreign country. Respondent,

---

[21] The only exception to the above is this: petitioner should be considered the owner of the gas reserves in the ground in the Cook Inlet; although petitioner had leased the wells, petitioner owned the reserves in the ground under the lease. The parties have stipulated the values of these reserves in the years in question. Note further that certain identifiable additions or changes in the pipeline equipment were to be considered Phillips' property, pursuant to the lease with PGSC; see sec. 4 of our findings of fact.

thus, maintains that any property not in either country should not be used in the property apportionment fraction. We agree with respondent.

The ordinary and plain meaning of example (2)(ii) is that it includes only property within the United States and within the foreign country. Such an interpretation does not produce futile results, nor have we been presented with unequivocal evidence of administrative intent supporting petitioner's position. We note that since the taxable income being apportioned is derived from cross-border sales, the drafters of the regulation must have been aware that inventory would be included as property and that in many cross-border sales inventory would at times be neither within the United States nor within the foreign country. Respondent, we believe, would have provided a special rule for allocating property located within neither the United States nor the foreign country had she intended to include it in the property apportionment fraction. We note that respondent did provide a special rule for allocating bills or accounts receivable. Sec. 1.863-3(b)(2), *Example (2)(v)*, Income Tax Regs. Thus, we conclude that the property apportionment fraction does not include property that is neither within the United States nor within the foreign country. With respect to this case, Phillips' LNG inventory that was in international waters is not property either within the United States or within Japan for purposes of example (2), and, consequently, it is not included in the property apportionment fraction.

The parties also disagree over the location of the accounts receivable from Phillips' sale of LNG to Tokyo Electric and Tokyo Gas. Petitioner claims that the accounts receivable are located in Japan. Respondent in her opening brief also allocated the accounts receivable in their entirety to Japan; in her reply brief she asserts that they should not be located within Japan.

The parties note that subdivision (v) of example (2) states that accounts receivable are to be allocated to the United States if the debtor resides there, unless the taxpayer has no office, branch, or agent in the United States. They both rely on section 1.863-6, Income Tax Regs., which provides that the principles applied in sections 1.861-1 to 1.863-5, Income Tax Regs., to determine, inter alia, that taxable income from sources within the United States shall *generally* be applied

in determining the taxable income from sources within and without a foreign country. Thus, they read subdivision (v) of example (2) as requiring that accounts receivable are to be allocated to Japan since Tokyo Electric and Tokyo Gas are Japanese entities, unless Phillips did not have an office, branch, or agent in Japan. The parties disagree as to whether Phillips had an office, branch, or agent in Japan. We believe that PPIL, given the level of assistance it provided Phillips, and with offices in Japan, was at least Phillips' agent in Japan, although not a selling agent for Phillips' LNG.

We also believe that the accounts receivable would be located in Japan, although our reading of example (2)(v) may be a bit different from that of the parties. As we read the rather convoluted provisions of this paragraph, it means that bills and accounts receivable shall (unless a satisfactory contrary reason is shown) be allocated to a location in the United States only when the debtor resides in the United States, with one exception: even if the debtor resides in the United States, the allocation to the United States does *not* apply if the taxpayer (i.e., creditor) does not have an office, branch, or agent in the United States. Neither Tokyo Electric nor Tokyo Gas resided in the United States, but Phillips did and had an office there, too; under the provisions of subdivision (v) of example (2), the accounts receivable are not properly located within the United States. We conclude that the Phillips' accounts receivable arising from the sale of LNG to Tokyo Electric and Tokyo Gas should be allocated to Japan for purposes of example (2).

### c. *Shōken as an Asset*

Petitioner asserts that it had shōken to sell LNG to Tokyo Electric and Tokyo Gas, that shōken was an intangible asset that helped to produce the Phillips' LNG sales income, and that this shōken was located in Japan. Consequently, it concludes that the fair market value of the shōken to sell LNG to Tokyo Electric and Tokyo Gas should be included in the property apportionment fraction under example (2).

Respondent does not dispute that an intangible such as goodwill or shōken is property for purposes of the property apportionment fraction. The definition of "property" for purposes of the fraction is broad enough to include any shōken,

goodwill, or going concern value which was a factor in producing the income from the cross-border sales. Respondent, however, does assert that petitioner did not establish the existence of this asset or its value.

The only evidence introduced at trial regarding shōken came from petitioner's expert, Kozo Yamamura (Yamamura), a professor of business and Japanese and East Asian studies at the University of Washington, in the form of testimony and an expert report. We note initially that petitioner's expert did not define "shōken" to the extent we would have liked. The impression left by his report and testimony is that shōken is a marketing intangible similar to our concept of goodwill, is established by a contract, and is affected by the extent of Japanese type interfirm relations between the seller and buyer. Japanese type interfirm relations may be more intensive and involve more cooperation between the firms than relations between U.S. businesses.[22]

Petitioner relies entirely on Yamamura's expert report and testimony in establishing that petitioner had shōken to sell LNG to Tokyo Electric and Tokyo Gas and the value of the alleged shōken Phillips may have had. We are not persuaded that petitioner established the existence or value of such property.

Yamamura focused on several facts in concluding that Phillips had shōken to sell LNG to Tokyo Electric and Tokyo Gas. He emphasized that the efforts made by Phillips' sales staff, including representatives of PPIL, to build relationships of trust with representatives of Tokyo Electric and Tokyo Gas contributed to Phillips' winning the contract to supply Tokyo Electric and Tokyo Gas with LNG. Yamamura states that Phillips' shōken to sell LNG came into being when the LNG sales agreement was executed. Following the execution of the LNG sales agreement, Yamamura notes that the parties thereto continued to act in a manner consistent with the presence of shōken.

We are unpersuaded that Phillips had developed such Japanese type business relationships with Tokyo Electric and Tokyo Gas that would warrant including shōken as an asset in the property apportionment fraction. We observe that

---

[22] Compare our description of keiretsu, found in our findings of fact. We have not found that Phillips was a member of a keiretsu here.

Japan was and is an energy-poor country dependent on other countries for the energy it needs. Thus, its energy industry would have been motivated to develop business relations with suppliers from other countries to obtain energy. With respect to the actual dealings between Phillips and the buyers, the record reveals that they were lengthy and involved, and not without sharp differences. Furthermore, Tokyo Electric and Tokyo Gas did not appear to play favorites among potential suppliers of LNG, and in fact made them compete against each other for the contract. Despite Phillips' and Marathon's having won the contract to supply LNG, the price renegotiations were complicated, with both sides at these meetings taking significantly differing positions.

We find particularly damaging to petitioner's case regarding the existence of shōken that it did not call as a witness any officer or official of either of Tokyo Electric or Tokyo Gas. Moreover, Yamamura did not interview such individuals when researching whether Phillips had shōken to sell LNG to these entities. We would have found instructive their description of the business relationship between Phillips and Tokyo Electric and Tokyo Gas. Other than the expert, who had no independent knowledge of the relations between the companies, all we have here is the testimony of Phillips' employee Horn, who was not a disinterested witness.

We also note that Yamamura in his expert report stated that Japanese type relations based on shōken are beneficial to the parties involved since such relations lower the cost of the transactions and cost of contract enforcement, and allow the parties to maximize their profitability over the long term. We have already noted the disagreements that Phillips and Tokyo Electric and Tokyo Gas had regarding the price of LNG. We also believe that Phillips' profits from the sale of LNG were dependent more on the need of Tokyo Electric and Tokyo Gas for LNG than on the level of cooperation between the parties. If the relationship between Phillips and Tokyo Electric and Tokyo Gas had been based on trust and understanding as claimed by petitioner, one would have expected that the negotiators would have exhibited more cooperation. The record indicates that Phillips and Tokyo Electric and Tokyo Gas conducted business together; the relationship did not appear to be significantly different from that involving dealings between U.S. corporations. We conclude that peti-

tioner has failed to establish that it had shōken to sell LNG to Tokyo Electric and Tokyo Gas.

Even if petitioner had shown that it had shōken, the question of value remains. Petitioner asserts that at least 3.5 percent of Phillips' annual Japanese LNG revenue was attributable to shōken. Petitioner's valuation of its shōken was based upon only Yamamura's opinion of its worth.[23]

Yamamura based his estimate of the value of petitioner's shōken, in part, on the sales of two Japanese general trading companies. The first sale involved the acquisition of the Ataka general trading company by C. Itoh, also a general trading company and also a member of Ataka's keiretsu. The second sale involved the acquisition of Kinoshita Trading Co. (Kinoshita), a medium-sized specialist trading company with shōken to trade iron and steel, by Mitsui Trading Co., a large general trading company. The value of Kinoshita's shōken was reflected, Yamamura asserts, in a settlement of a tax controversy between Mitsui and the Japanese Ministry of Finance. We do not believe that these transactions provide any foundation for determining the level of shōken Phillips may have had to sell LNG to Tokyo Electric and Tokyo Gas. Both Ataka and Kinoshita were Japanese trading companies and the products in which they had shōken did not include LNG. Very little evidence was presented showing that the relationship Phillips had with Tokyo Electric and Tokyo Gas was similar to the relationships that Ataka and Kinoshita had with the companies for whom they provided the services of a general trading company and that the products they dealt in were sufficiently similar to LNG to provide a reasonable basis for an estimation of value of Phillips' alleged shōken. Phillips was not a general trading company. Phillips' LNG was sold in a competitive market, was required by these Japanese utilities, and was sold according to long-term contract. We also note that no comparison was made as to the difference in customer loyalty that a general trading company may have and the customer loyalty that Phillips experienced. We do not believe that the sales of Ataka and

---

[23] For purposes of the property apportionment fraction, petitioner claims that the shōken had a fair market value of at least $8.5 million in 1976, $9.4 million in 1977, and $9.1 million in 1978. We do not know whether Phillips carried any value for shōken, or goodwill with its Japanese customers, on its balance sheet.

Kinoshita provide any basis for estimating petitioner's shōken.

We conclude that petitioner has not provided us with a reasonable basis for determining the value of shōken that it may have had to sell LNG to Tokyo Electric and Tokyo Gas.[24]

### d. *The Value of Assets*

The next problem we address is the proper value of other property to use in the property apportionment fraction. According to example (2)(iv), the property apportionment fraction employs the property's average value, which is derived using its actual value. Other than the circumstances in which example (2)(iv) deems that property should have a particular value, actual value in general, the parties agree, means fair market value. We concur since the ordinary or plain meaning of "actual value" is "fair market value". See Black's Law Dictionary 35 (6th ed. 1991) (actual value and market value are convertible terms).

The parties dispute whether actual value includes the assessed value of the gas reserves for purposes of the Alaskan oil and gas ad valorem tax.[25] Example 2(iv) states that for property valued or appraised for "purposes of inventory, depreciation, depletion, or other purposes of taxation" actual value shall "be the highest amount at which so valued or appraised". Petitioner asserts that the participle phrase "appraised for * * * other purposes of taxation" includes appraisals undertaken for State tax purposes. Respondent claims that this phrase is limited to valuations or appraisals for purposes of Federal taxation only. We agree with respondent.

Subdivision (iv) of example (2) mentions valuations or appraisals that shall constitute the property's actual value as including specifically those made for purposes of inventory, depreciation, or depletion. All of these valuations must be made to apply certain provisions of the Internal Revenue

---

[24] We note that petitioner did not rely on any method that we have recognized in valuing goodwill. See, e.g., *Toledo Newspaper Co. v. Commissioner*, 2 T.C. 794 (1943); *Rock Spring Distilling Co. v. Commissioner*, 2 B.T.A. 207 (1925). We have analyzed petitioner's method of valuation, which relies on comparing the alleged shōken of Phillips with that of Japanese trading companies, simply to show that even according to that method, petitioner did not establish a reasonable estimate of its shōken to sell LNG to Tokyo Electric and Tokyo Gas.

[25] The assessed value of Phillips' gas reserves for purposes of the Alaskan ad valorem tax are available only for 1976 and 1977.

Code. Furthermore, we note that this provision may be construed to reduce the number of items for which fair market value must be obtained, particularly where a value has already been assigned to the property for Federal tax purposes. We do not believe that the drafters of the regulation intended to rely on State property assessments, particularly where there may be no connection between the property's assessed value and its fair market value. We note that for 1976 and 1977, as the parties have stipulated, the assessed value of the gas reserves for purposes of Alaska's ad valorem tax was several hundred million dollars less than the fair market value of these reserves. Therefore, we conclude that only valuation or appraisals for purposes of *Federal* tax law, in the absence of proof of actual value, shall be treated as a property's actual value.

As to the values of the other assets which go into the computation of the fraction based upon assets within and without the United States, pursuant to example (2)(ii), we understand the parties have agreed by stipulation.

Since this opinion, together with the prior opinions rendered in this case, appears to dispose of all the issues which have been raised,

*Decision will be entered under Rule 155.*

---

## APPENDIX

As in effect for the years at issue, section 1.863-3(b)(2), Income Tax Regs., provided as follows:

(2) *Allocation or apportionment.* The taxable income from sources within the United States, in the case of the items to which this paragraph applies, shall be determined according to the examples set forth in this subparagraph. For such purposes, the deduction for the personal exemptions shall not be taken into account, but the special deductions described in paragraph (c) of § 1.861-8 shall be taken into account.

*Example (1).* Where the manufacturer or producer regularly sells part of his output to wholly independent distributors or other selling concerns in such a way as to establish fairly an independent factory or production price—or shows to the satisfaction of the district director (or, if applicable, the Director of International Operations) that such an independent factory or production price has been otherwise established—unaffected by considerations of tax liability and the selling or distributing branch or depart-

ment of the business is located in a different country from that in which the factory is located or the production carried on, the taxable income attributable to sources within the United States shall be computed by an accounting which treats the products as sold by the factory or productive department of the business to the distributing or selling department at the independent factory price so established. In all such cases the basis of the accounting shall be fully explained in a statement attached to the return for the taxable year.

*Example* (2). (i) Where an independent factory or production price has not been established as provided under example (1), the taxable income shall first be computed by deducting from the gross income derived from the sale of personal property produced (in whole or in part) by the taxpayer within the United States and sold within a foreign country or produced (in whole or in part) by the taxpayer within a foreign country and sold within the United States, the expenses, losses, or other deductions properly allocated and apportioned thereto in accordance with the rules set forth in § 1.861-8.

(ii) Of the amount of taxable income so determined, one-half shall be apportioned in accordance with the value of the taxpayer's property within the United States and within the foreign country, the portion attributable to sources within the United States being determined by multiplying such one-half by a fraction the numerator of which consists of the value of the taxpayer's property within the United States, and the denominator of which consists of the value of the taxpayer's property both within the United States and within the foreign country. The remaining one-half of such taxable income shall be apportioned in accordance with the gross sales of the taxpayer within the United States and within the foreign country, the portion attributable to sources within the United States being determined by multiplying such one-half by a fraction the numerator of which consists of the taxpayer's gross sales for the taxable year or period within the United States, and the denominator of which consists of the taxpayer's gross sales for the taxable year or period both within the United States and within the foreign country.

(iii) The term "gross sales", as used in this example, refers only to the sales of personal property produced (in whole or in part) by the taxpayer within the United States and sold within a foreign country or produced (in whole or in part) by the taxpayer within a foreign country and sold within the United States.

(iv) The term "property", as used in this example, includes only the property held or used to produce income which is derived from such sales. Such property should be taken at its actual value, which in the case of property valued or appraised for purposes of inventory, depreciation, depletion, or other purposes of taxation shall be the highest amount at which so valued or appraised, and which in other cases shall be deemed to be its book value in the absence of affirmative evidence showing such value to be greater or less than the actual value. The average value during the taxable year or period shall be employed. The average value of property as above prescribed at the beginning and end of the taxable year or period ordinarily may be used, unless by reason of material changes during the taxable year

or period such average does not fairly represent the average for such year of period, in which event the average shall be determined upon a monthly or daily basis.

(v) Bills and accounts receivable shall (unless satisfactory reason for a different treatment is shown) be assigned or allocated to the United States when the debtor resides in the United States, unless the taxpayer has no office, branch, or agent in the United States.